**In re Clifford Alexander DEMOFF, Linda Joan Demoff, Debtors.**

**Bankruptcy No. 87–61378.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division at Gary/Lafayette.

Dec. 29, 1989.

See also, Bkrtcy., 90 B.R. 391.

Angelo Sabato, I.A. Woloshansky, Merrillville, Ind., for debtors.

*MEMORANDUM OPINION
AND ORDER*[1]

KENT LINDQUIST, Chief Judge.

## I

### Statement of Proceedings

This matter is before the Court on the motion of Clifford Alexander Demoff and Linda Joan Demoff, the Chapter 13 Debtors herein (hereinafter: "Debtors"), filed on December 22, 1988 to determine the value of the mortgage lien of Provident Institution for Savings for the City of Boston (hereinafter: "Provident") in the sum of $48,500.00 or the alleged market value thereof, and to allow Provident's claim in excess of the market value as an unsecured claim. Provident filed its objection to the Debtors' motion on January 13, 1989. The Court held a pre-hearing conference on this matter on February 28, 1989. The parties advised they were conducting settlement negotiations, and the Court ordered that if no settlement was reached by April 4, 1989, the Court would enter an order setting a briefing schedule on the legal issues indicated. A telephonic status conference on April 4, 1989, and the parties having stipulated that there were no issues of material fact at this time agreed that there was no need to submit evidence because the dispute was a question of law only. The legal issue presently before the Court is whether the chapter 13 debtors may value Provident's collateral pursuant to § 506(a) and void its mortgage to the extent to the extent Provident is unsecured pursuant to § 506(d) notwithstanding § 1322(b)(2) and when that mortgage is secured only by the debtor's principal residence. The parties have not stipulated as to the value of the real estate which is a factual issue the Court may have to address at a later time.

## II

### Statement of Facts

Provident filed an action against the Debtors to foreclose its note and mortgage in the Lake County Circuit Court C87–1315 on March 25, 1987. Provident obtained a judgment on May 27, 1987, and scheduled the property for a sheriff's sale to be held on September 18, 1987.

The Debtors filed this Chapter 13 proceeding on July 24, 1987. The Debtors' Schedule A–2 lists a debt to Provident in the amount of $44,277.44 secured by a mortgage in the Debtors' residence, which has a stated fair market value of $48,-500.00. Schedule A–2 further lists an arrearage of $4,761.12. On September 18, 1987, Provident filed a proof of claim in the amount of $55,130.69, and objected to the Debtors' plan. Provident itemized the amounts due on its mortgage as follows:

| | |
|---|---:|
| Principal | 44,277.44 |
| Interest from 9/1/86 to 8/31/87 at 14% | 7,231.98 |
| Escrow deficiency | 205.77 |
| Attorney fees & costs | 3,415.50 |
| | $55,130.69 |

## III

### Conclusions of Law and Discussion

No objection was made by counsel to the jurisdiction of this Court to this matter, the Court finds jurisdiction to be present, and that this contested matter is a core proceeding pursuant to 28 U.S.C. § 157.

The precise legal issue presently before the Court is whether pursuant to § 506(a) a Chapter 13 debtor can bifurcate a claim secured only by the Debtor's principal residence into an allowed secured claim and an allowed unsecured claim when the holder of that security interest is undersecured, and to the extent that the lien secures a claim against the debtors that is not an allowed secured claim void such lien pursuant to § 506(d) in his plan, notwithstanding § 1322(b)(2), which provides that a debtor's plan may not modify a claim secured only by a security interest in real property that is the debtors' principal residence.

The resolution of this issue involves the application of several provisions of the Bankruptcy Code.

---

1. This Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52 as made applicable by Bankruptcy Rules 9014 and 7052.

Section 506(a) bifurcates a creditor's claim into secured and unsecured components and provides as follows:

### § 506. Determination of secured status.

(a) *An allowed claim* of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, *is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property*, or to the extent of the amount subject to setoff, as the case may be, *and is an unsecured claim to the extent that the value of such creditor's interest* or the amount so subject to setoff *is less than the amount of such allowed claim. Such value shall be determined* in light of the purpose of the valuation and of the proposed disposition or use of such property, and *in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.* (Emphasis supplied).

2. Section 506(d) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, July 10, 1984 ("BAFJA"). *Prior* to BAFJA, § 506(d) read as follows:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—
   (1) a party in interest has not requested that the court determine and allow or disallow such claim under section 502 of this title; or
   (2) such claim was disallowed only under section 502(e) of this title.

The Senate Report to this section as *presently* constituted as a result of BAFJA states as follows:

Paragraph (1) makes technical correcting changes. Paragraph (2) adds a new provision, the purpose of which is to make clear that the failure of the secured creditor to file a proof of claim is not a basis for avoiding the lien of the secured creditor. (S Rep. No. 65, 98th Cong., 1st Sess. 79 (1983) (Senate Report accompanying S 445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner of the Bankr.Amend. of 1984))

Collier on Bankruptcy in commenting on § 506(d) states as follows:

The Bankruptcy Amendments and Federal Judgeship Act of 1984 rewrote paragraphs (1) and (2), clarifying some of the ambiguities that had given rise to litigation thereunder. Section 506(d) provides for the avoidance of any lien securing a claim which is not allowed

Section 506 is implemented by Bankruptcy Rule 3012 which provides as follows:

### Rule 3012. Valuation of Security.

The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

Section 506(d) provides for the partial or complete avoidance of a lien to the extent that a lien is not a secured claim as defined in § 506(a). Section 506(d) provides as follows:

(d) *To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—*
   (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
   (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.[2]

except under the following explicitly enumerated circumstances: if the claim was disallowed only because (a) it had not yet matured pursuant to section 502(b)(5); (b) it was a claim for reimbursement or contribution within the purview of section 502(e); or (c) no entity had filed a proof of claim with respect thereto pursuant to section 501. In all other instances, a lien securing a disallowed claim is void.

Under section 506(d), prior to its amendment in 1984, a lien could not be avoided if "a party in interest [had] not requested that the court determine and allow or disallow such claim under section 502." This provision in effect required that the lienholder be given the opportunity for its "day in court" before any action affecting the lien could be taken. If no party in interest requested allowance or disallowance of the claim, the lien would survive the bankruptcy case even if the entire personal liability of the debtor were extinguished. The amended section 506(d) incorporates the notice aspect of prior section 506(d) by providing that liens will not be avoided solely because a proof of claim has not been filed.

Thus, there are occasions when the holder of a secured claim will have greater protection with respect to its lien than with respect to the claim secured by the lien. If the holder never becomes aware of the debtor's bankruptcy case (and, in a chapter 11 case, its

The legislative history to § 506(a) as set out in the Senate Report states as follows:

claim is not scheduled or is scheduled as disputed, contingent or unliquidated), its claim may nonetheless be discharged by reason of its failure to file a proof of claim. However, in order for its lien to be avoided, either the holder or another person entitled to do so must file a proof of claim with respect to the holder's claim or otherwise seek disallowance of the claim or avoidance of the lien. The holder would, of course, be entitled to "notice and a hearing" with respect to an objection to the filed proof of claim.

Section 506(d) has no precedent under the 1898 Act. Instead, it appears to be a combination of pre-code case law to the effect that liens may pass through a bankruptcy case unaffected and former Bankruptcy Rule 306(d), which provided for the determination by the court of the value of security interests held by secured claimants who file proofs of claim and the allowance of such claims only to the extent enforceable for any excess of the claim over such value. The application of section 506(d) to avoid a junior lien acquired after the effective date of the 1978 Code was found not to be a deprivation of property in violation of the Fifth Amendment, because it merely implements in a bankruptcy court the effect on a junior lien that would occur in a foreclosure sale outside of bankruptcy when the collateral is exhausted in paying the holder of the senior lien. The same court said its holding would not have been different if the lien had been acquired prior to the effective date of the Code.

\* \* \* \* \* \*

Other issues remain unresolved. For example, section 506(d) was changed pursuant to the 1984 amendments to make clear that a lien would survive notwithstanding the failure of the holder to file a proof of claim for the related claim. Prior to the amendment, section 506(d) required as a precondition to the avoidance of a lien thereunder a request by a party in interest that the bankruptcy court determine and allow or disallow such claim under section 502. Subsections (a) and (b) of section 502, read together, require as a prerequisite to the allowance of claim the filing of a proof of claim with respect thereto. The debtor or trustee can file a proof of claim only if the holder of the claim has not timely filed proof thereof. Consequently, notwithstanding the clarifications of the 1984 amendment with respect to lien survival, if no proof of claim is filed, issues persist as to whether the debtor or trustee can use section 506(d) to avoid a lien securing a claim for which no proof of claim has been filed and as to whether the particular actions taken by the party seeking avoidance meet the requirements of section 506(d).

*Subsection (a) of this section separates an undersecured creditor's claim into two parts: He has a secured claim*

Most courts do not require that a proof of claim be filed prior to lien avoidance under section 506(d). Thus, complaints or applications to determine the status of the relevant claim under section 506(a), or similarly styled pleadings, have been accepted as the requisite request under section 506(d) for allowance of disallowance. It is important to note that all pleadings so accepted provided for actual notice to the lienholder and an opportunity for a hearing. The mere scheduling of the relevant claim as unsecured is not adequate. This appears to be the better view because, among other reasons, lien avoidance under section 506(d) can occur for reasons unrelated to disallowance of the underlying claim.

A minority view does require that a proof of claim be filed prior to lien avoidance. It thus appears that in order to avert delays in promulgating chapter 11 or chapter 13 plans which must treat disputed secured claims or in selling property which is subject to disputed liens, a party in interest may be required to bring an adversary proceeding pursuant to Bankruptcy Rule 7001 "to determine the validity, priority, or extent of a lien or other interest in property" if proof of the relevant claim has not been filed (and the time to so file has not expired) rather than attempt to proceed under section 506(d).

Several additional areas of statutory interpretation with respect to section 506(d) remain unresolved. Some courts have held that section 506(d) can be used to void a lien only to the extent the underlying claim has been disallowed under section 502, but not to the extent the claim is not allowable as a secured claim under section 506(a). This reading is contrary to the express language of section 506(d) and the rationale of the better-reasoned cases.

\* \* \* \* \* \*

There is also a split in the case law as to whether section 1322(b)(2), which prohibits modification of the rights of the holder of a claim secured only by a security interest in the debtor's principal residence, prohibits in a chapter 13 case the application of section 506(a) and (d) to bifurcate such a claim and to void the lien to the extent the claim is not an allowed secured claim. *Although several courts have held the sections to be inconsistent and, therefore, have read section 1322(b)(2) to supersede section 506(a) and (d) in the narrower instances in which section 1322(b)(2) is applicable, the better view is that the sections are not inconsistent and that section 506(a) and (d) remains applicable.*
3 *Collier on Bankruptcy,* para. 506.67, pp. 566–68–76 (L. King 15th Ed.) (Footnotes omitted) (Emphasis supplied).

*to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim.* The subsection also provides for the valuation of claims which involve setoffs under section 553. While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. *Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim.* This provision abolishes the use of the terms "secured creditor" and "unsecured creditor" and substitutes in their places the terms "secured claim" and "unsecured claim." (S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854). (Emphasis supplied).

The Congressional Record Statements as to § 506(a) state as follows:

Section 506(a) of the House amendment adopts the provision contained in the Senate amendment and rejects a contrary provision as contained in HR 8200 as passed by the House. The provision contained in the Senate amendment and adopted by the House amendment recognizes that an amount subject to setoff is sufficient to recognize a secured status in the holder of such right. Additionally a determination of what portion of an allowed claim is secured and what portion is unsecured is binding only for the purpose for which the determination is made. Thus determinations for purposes of adequate protection is not binding for purposes of "cram down" on confirmation in a case under chapter 11. (124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978); S17411 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini).

Section 1322(b)(2) provides as follows:

(b) Subject to subsection (a) and (c) of this section, the plan may—

\*     \*     \*     \*     \*     \*

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

The Congressional Record Statement to § 1322(b)(2) states as follows:

Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment. (124 Cong.Rec. H11106–07 (daily ed. Sept. 28, 1978); S17423 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcinci).

It is noted that Section 1322(b)(2) of H.R. 8200 simply provided that the plan may "modify the rights of holders of secured claims or holders of unsecured claims." (H.R.Rep. No. 595, 95th Cong. 1st Sess. 429 (1977), U.S.Code Cong. & Admin.News 1978, p. 6384). The Senate version of § 1322(b)(2) in S 2266 provided that the plan "could modify the rights of holders of secured claims (other than claims *wholly* secured by mortgages on real property) or of holders of unsecured claims." (S.Rep. No. 989, 95th Cong., 2nd Sess. 141 (1978)). (Emphasis added). *See,* Norton Bankruptcy Law and Practice, Bankruptcy Code, *Legislative History and Comment,* § 1322, Editor's Comment. (Callaghan & Co. 1988–89). It is noted that § 1322(b)(2)

as finally enacted uses the modifier "only" rather than "wholly".

Several other sections of the Bankruptcy Code come into play in addition to § 506(a) and § 1322(b)(2). Section 103(a) comes into play in that it provides that, "Except as provided in section 1161 of this title, Chapters 1, 3, and 5 of this title apply in a case under Chapter 7, 11, 12 or 13 of this title.

On the other hand, pursuant to § 103(h) chapter 13 only applies to cases under that chapter.

Section 101(33) defines a "lien" as a "charge against or an interest in property to secure payment of a debt or performance of an obligation; ..."

Section 101(45) defines a "security interest" as a "lien created by an agreement."

Section 101(4)(A) defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; ..."

Section 1325(a)(5)(B)(ii) provides that the Court shall confirm a plan if—"(5) with respect to *each allowed secured claim* provided for by the plan—(B)(ii), the value, as of the effective date of the plan, of property to be distributed under the plan, on account of such claim is not less than the allowed amount of such claim; ..."

Not surprisingly, the Courts have split over the issue before the Court.

The following Courts have held that a chapter 13 plan that bifurcates an undersecured creditor's claim in a debtor's principal residence into secured and unsecured portions pursuant to § 506(a) does not violate the Bankruptcy Code proscription found in § 1322(b)(2) against the modification of a claim secured only by a security interest in the debtor's principal residence. *In re Hougland,* 886 F.2d 1182 (9th Cir. 1989), *affirming* 93 B.R. 718 (D.Ore.1988); *In re Wilson,* 1989 WL 89956, 1989 U.S. Dist. Lexis 9217 (E.D.Pa.1989); *In re Hill,* 96 B.R. 809 (Bankr.S.D.Ohio 1989); *In re Frost,* 96 B.R. 804 (Bankr.S.D.Ohio 1989); *In re Harris,* 94 B.R. 832 (D.N.J.1989); *In re Kehm,* 90 B.R. 117 (Bankr.E.D.Pa.1988);

*In re Jablonski,* 70 B.R. 381 (Bankr.E.D. Pa.1987), *aff'd. and remanded,* 88 B.R. 652 (E.D.Pa.1988) (remanded on procedural ground that no Chapter 13 plan was before the bankruptcy court); *In re Shaffer,* 84 B.R. 63, 65–66 (Bankr.W.D.Va.1988) (Appears to be dicta as Court held that § 1322(b)(2) only applied to long-term home mortgages); *In re Simmons,* 78 B.R. 300 (Bankr.D.Kan.1987); *In re Caster,* 77 B.R. 8 (Bankr.E.D.Pa.1987); *In re Bruce,* 40 B.R. 884 (Bankr.W.D.Va.1984); *In re Spadel,* 28 B.R. 537 (Bankr.E.D.Pa.1983) (held that although mortgage lien of unsecured creditor in debtor's residence was not an allowed secured claim pursuant to § 506(a) the lien was not voided under § 506(d)(1) as the debtors had not requested the court to determine and allow or disallow the claim pursuant to § 502 (pre–BAFJA version of § 502); *In re Neal,* 10 B.R. 535 (Bankr.S.D. Ohio 1981). *See also, In re Everett,* 48 B.R. 618 (Bankr.E.D.Pa.1985), and *In re Cosby,* 33 B.R. 947 (Bankr.E.D.Pa.1983). In *Everett* and *Cosby* the Court allowed an independent adversary proceeding under § 506(d) in a chapter 13 to void a lien, and Section 1322(b)(2) was not discussed.

In addition, Collier on Bankruptcy supports the above result. That treatise states as follows:

> [s]ince this section [§ 1322(b)(2) ] only applies to modification of the rights of holders of claims by the chapter 13 plan, it does not affect the determination of the allowed secured claim through the operation of section 506. Hence an undersecured claim secured only by a security interest in the debtor's principal residence may still be divided into an allowed secured claim and an allowed unsecured claim, with the lien declared void to the extent it secures a claim in excess of the allowed secured claim.

5 Collier on Bankruptcy, par. 1322.06, p. 1322–15 (L. King 15th ed.) (Footnotes omitted). *See also,* Footnote 1 *supra.*

On the other hand, a minority of the Courts have held that § 1322(b)(2) which prohibits the modification of a claim secured only by a security interest in the debtor's principal residence requires the al-

lowance of such claim for the balance owing on such debt regardless of the value of the collateral. *In re Russell,* 93 B.R. 703 (D.N.D.1988); *In re Catlin,* 81 B.R. 522 (Bankr.D.Minn.1987); *In re Hemsing,* 75 B.R. 689 (Bankr.D.Mont.1987); *In re Hynson,* 66 B.R. 246 (Bankr.D.N.J.1986) (overruled by *In re Harris,* 94 B.R. 832 (D.N.J. 1989); *Matter of Smith,* 63 B.R. 15 (Bankr. D.N.J.1986); *In re Simpkins,* 16 B.R. 956 (Bankr.E.D.Tenn.1982) (Court did not address interplay between § 506(a) and § 1322(b)(2), but held generally that § 1322(b)(2) prevents the application of the "cram down" provision of § 1325(a)(5)(B)).

Provident in its brief cites *Hynson,* 66 B.R. 246, *supra,* and *Smith,* 63 B.R. 15, *supra,* in support of its position, and argues that if § 506 were allowed to prevail over § 1322 it would render § 1322 meaningless for if a claim is no longer secured by § 506(a), and § 1322(b)(2) does not apply, the exception in § 1322(b)(2) relating to the debtor's principal residence is unnecessary. As a matter of statutory construction Provident urges that a statute should not be interpreted so as to leave any portion of it without any meaning whatsoever, *citing, Hynson,* 66 B.R. 246, *supra; Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *In re Tom Carter Enterprises,* 49 B.R. 243 (Bankr.C.D.Cal. 1985). It is noted that neither *Rosado* or *Tom Carter* dealt with the issue of the interplay of § 506(a) and (d) and § 1322(b)(2), but discussed the general rules of statutory construction.

Provident urges that § 1322 and § 506 should not be interpreted in such a way as to be at odds with each other, and that a bankruptcy statute should be considered in its entirety wherein all of its parts are construed to be internally consistent, *citing, In re Hildebran,* 54 B.R. 585 (Bankr. D.Ore.1985).

It is noted that *Hildebran* did not decide the precise issue before the court, but held that § 1322(b)(5) does not permit modification of a prepetition short-term debt obligation into an obligation extending beyond the plan term.

Provident argues that by enacting § 1322(b)(2), Congress created a special protection for institutional lenders engaged only in long-term mortgage financing who take security interests exclusively in homesteads or residences, *citing, Matter of Foster,* 61 B.R. 492 (Bankr.N.D.Ind.1986); *In re Lindamood,* 34 B.R. 330 (Bankr.W.D. Va.1983), and that the legislative intent behind § 1322(b)(2) was to provide stability in the long-term residential housing market. *In re Hildebran,* 54 B.R. 585, *supra; Matter of Smith,* 63 B.R. 15, *supra.* Neither *Foster* nor *Lindamood* decided the issue of whether § 506(a) applied notwithstanding § 1322(b)(2). *Foster* held that absent a cure situation under § 1322(b)(5) no payments beyond the term of the Chapter 13 plan can be involuntarily imposed on the creditor pursuant to § 1322(b)(2), (5) and (c), while *Lindamood* did not involve a debtor's principal residence, and thus § 1322(b)(2) was held not applicable. *See also,* § 1328(a)(1) and (c)(1), the Chapter 13 discharge section which excepts from discharge debts dealt with under § 1322(b)(5), and § 1322(c) which provides that a plan may not provide for payments over a period that is longer than the plan period. The above sections go to the treatment and discharge of long-term debt, but do not address the voidability of a lien secured by long-term debt under § 506(a) and § 506(d).

Provident asserts that § 1322(b)(2) and § 506(a) are reconcilable in that § 1322(b)(2) is specific in its application to Chapter 13 cases only as opposed to § 506(a) which is general, and applies to all chapters, and thus the specificity of the language in § 1322(b)(2) must prevail over the general language of § 506(a).

Finally, Provident makes certain public policy arguments. It concludes that to allow the debtors to "cram down" a first mortgage on residential real estate would result in "havoc" in the long-term lending community. Provident asserts that long-term lenders look to the security of its investment as well as any type of insurance provided by the FHA or a private mortgage insurance company or any type of guaranty by the VA, and that to allow a cram down as to federally insured guaranteed loans

would result in a "raid" on the public treasury, and in turn dry up prospective home-owners access to mortgage funds.

The conflicting results reached by the various courts reflects the courts application of differing principles of statutory construction. Those courts that prohibit the valuation of a security interest solely in the chapter 13 debtor's principal residence under § 506(a) have used the following approaches.

In *In re Russell*, 93 B.R. 703, 705 (D.N.D.1988), the Court noted that the plain meaning of the statutory language is the primary, and ordinarily the most reliable source of interpreting the meaning of a statute, *citing, Watt v. Alaska*, 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678 n. 9, 68 L.Ed.2d 80 (1981). The *Russell* Court noted that pursuant to § 103(a), § 506(a) generally applies to cases under chapter 7, 11 and 13 (and also 12), while pursuant to § 103(h), § 1322(b)(2) only applies to a case under chapter 13, and thus the *Russell* Court applied the statutory rule of construction that holds that when two statutes conflict, regardless of the general inclusiveness of the general language of a statute, it does not apply or prevail over matters specifically dealt with in another part of the same enactment, *citing, Maiatico v. United States*, 302 F.2d 880, 886 (D.C.Cir. 1962). Thus, the *Russell* Court concluded that to the extent § 1322(b)(2) was inconsistent or contradictory with § 506(a), § 1322(b)(2) supersedes § 506(a), and that in a chapter 13 case the allowed amount of a claim secured only by the principal residence of the debtors is, at filing, the balance owing on the debt without regard to the value of the collateral, *citing, In re Hynson*, 66 B.R. 246, with approval. *Accord: In re Catlin*, 81 B.R. at 524, *supra.*

The Court in *In re Hemsing*, 75 B.R. 689, *supra*, also held that an undersecured second mortgagee was entitled to the protection of § 1322(b)(2) even to the extent of the unsecured debt, agreeing with the reasoning in *In re Hynson*, 66 B.R. 246, *supra*.

The Court in *In re Hynson* stated as follows:

It is clear that 11 U.S.C. § 506 establishes the extent to which a claim is a "secured claim" for bankruptcy purposes. Whether a claim is a "secured claim" is dependent upon the value of the collateral. If the value of the collateral is greater than the amount of the debt, the claim is oversecured. Pursuant to 11 U.S.C. § 506(b), holders of oversecured claims may recover out of the collateral, post-petition interest and reasonable fees, charges and costs provided for in the contract which is the basis of the claim. *See, In re Simpkins*, 16 B.R. 956, 965 (Bkrtcy.E.D.Tenn.1982).

On the other hand, 11 U.S.C. § 1322(b)(2) provides that a Chapter 13 plan may not modify the right of the holder of a claim which is secured only by a security interest in real property that is the debtor's principal residence.

In reconciling these two statutory sections, it must be noted that 11 U.S.C. § 506 is a provision of general applicability in cases under Chapters 7, 11 and 13 of the Bankruptcy Code. *See*, 11 U.S.C. § 103(a). On the other hand, 11 U.S.C. § 1322 applies only in cases under Chapter 13. *See*, 11 U.S.C. § 103(h). This court accepts the tenet of statutory construction which provides that regardless of the inclusiveness of the general language of a statute, it does not apply or prevail over matters specifically dealt with in another part of the same enactment. *See, Maiatico v. United States*, 302 F.2d 880, 886 (D.C.Cir.1962); *In re Brown*, 329 F.Supp. 422, 425 (S.D.Iowa 1971). Accordingly, while courts have recognized the general applicability of 11 U.S.C. § 506 in bankruptcy cases, its applicability has been limited where more specific statutory provisions apply, or where such application is inconsistent with the policy of the Bankruptcy Code.

\*     \*     \*     \*     \*     \*

This court agrees with the analysis of 11 U.S.C. § 1322(b)(2) contained in the *In re Simpkins* opinion. [16 B.R. 956 (Bankr.E.D.Tenn.1982)]. To apply the cramdown provisions of 11 U.S.C. § 506 to creditors whose claims are secured

solely by the debtor's principal residence, would in large part vitiate the protections of 11 U.S.C. § 1322(b)(2). It would also be at odds with the clear intent of Congress to protect a lender's security when a lender is secured only by a security interest in a chapter 13 debtor's home.

The Congressional history of 11 U.S.C. § 1322(b)(2) provides:

Section 1322(b)(2) of the House Amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment.

16 B.R. at 963 (quoting 124 Cong.Rec. § 17,424 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini); 124 Cong.Rec. H11, 106–11,107 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards)).

\* \* \* \* \* \*

This court disagrees with the analysis of 11 U.S.C. § 1322(b)(2) contained in *In re Spadel.* [28 B.R. 537 (Bankr.E.D.Pa. 1983)]. The concept that only a "secured claim" and not an "unsecured claim" of a mortgagee is protected within the ambit of 11 U.S.C. § 1322(b)(2), carries the syntax of the Bankruptcy Code to an absurd conclusion which is at odds with the general principles of statutory construction and with the clear legislative intent of 11 U.S.C. § 1322(b)(2). This court notes that 11 U.S.C. § 1322(b)(2) protects "a claim secured only by a security interest in real property that is the debtor's principal residence." The language of 11 U.S.C. § 1322(b)(2) does not specifically limit its protection to a *secured* claim secured only by a security interest in such real property. As noted by the court in the case of *In re Simpkins*, the emphasis in

determining the applicability of 11 U.S.C. § 1322(b)(2) should be on the existence of a claim, which is a right to payment. 16 B.R. at 963. Certain rights to payment were created by the enactment of 11 U.S.C. § 1322(b)(2), which this court will not disturb by the general application of 11 U.S.C. § 506.

*Id.* at 249–253.

It should be noted that *In re Hynson* was overruled in the later decision of *In re Harris*, 94 B.R. 832 (D.N.J.1989).

Finally, the court in *Matter of Smith*, 63 B.R. 15, *supra*, rejected the reasoning of *In re Spadel*, 28 B.R. 537 (Bankr.E.D.Pa. 1983), wherein the *Spadel* court held that based on § 506(a) an undersecured third mortgagee only had an allowed unsecured claim. The *Smith* court stated as follows:

This reasoning [*In re Spadel*] leaves section 1322(b)(2) without any *raison d'etre.* "Cramdown" presupposes that a secured creditor will retain its lien and that its rights will be modified if it is undersecured. If the claim is no longer secured under section 506(a), and section 1322(b)(2) does not apply, the exception for debtor's principal residence is unnecessary. A statute should not be interpreted so as to leave it with no meaning whatsoever. *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *In re Tom Carter Enterprises*, 49 B.R. 243 (Bkrtcy.C.D.Cal.1985).

\* \* \* \* \* \*

We must therefore go to statutory interpretation. Statutory interpretation is a somewhat tortured, but extremely vital process. The basic law applicable in situations where a statute creates a conflict (as exists here between sections 506 and 1322) is the premise that the specific overrides the general. Specifically, Judge Hanson in *In the Matter of Brown*, 329 F.Supp. 422 (S.D.Iowa 1971) stated:

Statute should receive a sensible construction, such as will effectuate the legislative intention, and, if possible avoid an absurd or unreasonable result ... (citations omitted) ... In construing a statute, it is necessary to

give effect to all its provisions if possible, and different portions of the act will not be held to be repugnant if they can be reconciled ... (citations omitted) ... However inclusive may be the general language of the statute, it will not be held to apply or prevail over matters specifically dealt with in another part of the same enactment. (citations omitted).

329 F.Supp. at 425.

*See also, Maiatico v. U.S.*, 302 F.2d 880 (D.C.1962); *Inter–Continental Promotions, Inc. v. MacDonald*, 367 F.2d 293 (5th Cir.1966) *cert. den.*, 393 U.S. 834, 89 S.Ct. 105, 21 L.Ed.2d 104, *appeal after remand*, 441 F.2d 1356, [ (5th Cir. 1971) ], *cert. den.*, 404 U.S. 850, 92 S.Ct. 85, 30 L.Ed.2d 89, *reh. den.* 404 U.S. 961, 92 S.Ct. 307, 30 L.Ed.2d 279.

In *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932), Justice Butler summed up the general rule stating:

General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment ... (citations omitted) ... Specific terms prevail over the general in the same or another statute which otherwise might be controlling. (citations omitted).

285 U.S. [at] 208, 52 S.Ct. [at] 323.

In *In re Anderson*, 3 B.R. 160 (Bkrtcy. S.D.Cal.1980), the court stated:

This Court does not agree that the proper sole purpose of a Chapter 13 is to rewrite a debtor's contract with secured creditors. To the extent that a Chapter 13 plan rewrites a secured creditor's contract, *incidental* to the carrying out of a plan, some alteration of contractual obligations is permissible.

3 B.R. [at] 162.

The case requires that the statute be read in its entirety and all of its parts should be construed so that they are internally consistent. 3 B.R. [at] 164. More recently, the Bankruptcy Court in Oregon was faced with a problem similar to the one in the instant matter in *In re Hildebran*, 54 B.R. 585 (Bkrtcy.D.Ore. 1985). The court there held that the term "principal residence" should be interpreted to mean principal residence. 54 B.R. [at] 586.

It is also necessary to examine the legislative history with respect to these sections of the Code. In Senate Report No. 95–989, accompanying the Bankruptcy Reform Act of 1978, the Committee Report out of the Judiciary states "[s]ubsection (b) permits a Chapter 13 plan ... to modify the rights of holders of secured and unsecured claim except claims wholly secured by real estate mortgages." S.Rep. No. 989, 95th Cong., 2d Sess. 141, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5927. While that statement appears to go farther than the statutory language, the original Senate version (S.2266) certainly showed an intent to avoid modification of real estate mortgages. The House version (H.R. 8200) omitted all reference to real estate and the final Bill limited the language to the debtor's principal residence. *See also* statements by Congressman Don Edwards, 1978 U.S.Code Cong. & Ad.News at 6481 and Senator Dennis DeConcini, 1978 U.S.Code Cong. & Ad. News at 6550. In similar language they described the final version as a compromise agreement which particularly protected real estate mortgages on the debtor's principle residence. The purpose of such a limitation is set out in *In re Hildebran, supra,* where Judge Wilhardt stated:

"The legislative intent behind § 1322(b)(2) was to provide stability in the long term residential housing market." (citation omitted)

54 B.R. [at] 586.

The Court finds that the principle of statutory interpretation which must be applied to the within case relies on the principle that section 1322(b)(2) is specific as opposed to section 506(a) and section 1322(b)(5) which are general. Further, the latter sections may not be used to cramdown a first mortgage on the debt-

or's principle residence as requested by the debtor herein.

The various statutes, furthermore, are easily reconciled. Section 1322(b)(2) permits the modification of rights as against section 506(a). On the other hand, section 1322(b)(5) does not deal with the modification of rights, but rather with the curing of a default and a de-acceleration thereof.

*Id.* at 16–18.

The Court now turns to the *ratio decidendi* of those cases that hold that § 506(a) may be employed by the Debtors to value a claim secured only by a security interest in real property that is the debtor's principal residence notwithstanding § 1322(b)(2).

The only Circuit Court to expressly address the issue to date is the Ninth Circuit in the case of *In re Hougland,* 886 F.2d 1182 (9th Cir.1989) which affirmed the District Court's Order *In re Hougland,* 93 B.R. 718 (D.Ore.1988) holding that the claims of a lender on residential real estate could be bifurcated in a chapter 13 case into a secured and unsecured portion, and that the lender's rights as to the unsecured portion could be modified.

The Ninth Circuit in *Hougland* cited the Supreme Court case of *United States v. Ron Pair Enter.,* — U.S. —, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989), which stated that, "Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on whether the lien is affixed; the remainder of that claim is considered unsecured." (Footnotes omitted). *Id.* at 1183.

The *Hougland* Court went on to add that when normal principles of statutory construction are applied, the analysis of the statutory scheme is relatively simple *citing, In re Seidel,* 752 F.2d 1382, 1384 (9th Cir.1985). *Id.* at 1183, n. 2. In *In re Seidel,* the Ninth Circuit held that under § 1322(b)(2) when the plan would extend the time for payment beyond the time originally contemplated by the creditor, the creditor's rights were modified and the plan could not be confirmed (note had reached due date before debtor's had filed

bankruptcy and provided for payment in installments over five years with a balloon).

The Court in *In re Seidel* stated as follows:

In making our own determination or the meaning of the word "modification" in subsection b(2), we must look to the "plain meaning" rule. "The starting point in every case involving construction of a statute is the language itself," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring), and while the circumstances of the statute's enactment may persuade us that "Congress did not intend words of common meaning to have their literal effect," *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981), the "plain meaning" of the language is "the primary, and ordinarily the most reliable, source of interpreting meaning" of a statute. *Id.* at 266 n. 9, 101 S.Ct. at 1678 n. 9 (*quoting Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). In our view, the plan meaning of the word "modification" in subsection b(2) must bar Seidel's plan. By postponing payment of the debt beyond the time originally contemplated by the parties to the contract, his plan clearly amounts to a unilateral "modification" of the original debt contract, as that word is ordinarily used.

*Id.* 752 F.2d at 1384.

Clearly then the *Hougland* Court distinguished the "modification" of the rights of the holder of a claim secured only by a security interest in real property that is the debtor's principal residence under § 1322(b)(2) from the "valuation" of a claim secured only by a security interest in real property that is the debtor's principal residence under § 506(a).

In fact the *Hougland* Court made direct reference to *Seidel,* and noted that *Hougland* is not in conflict with *Seidel* as in *Seidel* the Court was not dealing with an undersecured mortgage and simply had no occasion to reflect on the issue decided in *Hougland. Hougland,* 886 F.2d at 1185.

The *Hougland* Court noted that there are times when the quest for meaning should begin and end "with the language of the statute itself", *citing, United States v. Ron Pair Enter.*, 109 S.Ct. at 1030, and this was one of those time. *Id.* at 1183.

The *Hougland* Court analyzed both the express language of § 1322(b)(2) in some detail as well as the policy arguments asserted in support of a holding that § 1322(b)(2) is not controlled by § 506(a). This Court finds the reasoning persuasive and will quote the *Hougland* Court at length. The Court stated:

It should first be noted that it is clear that section 506(a) applies to Chapter 13 proceedings. *See* § 103(a). There is therefore, no reason to believe that the phrases "secured claim" and "unsecured claim" in section 1322(a)(2) have any meaning other than those given to them by section 506(a). It follows that Lomas claim had a "secured claim" and an "unsecured claim" component.

That being said, we can look at the "other than" clause. That clause follows the secured claim portion of the sentence and precedes the unsecured claim portion. Certainly it refers to what preceded it, and indicates that a secured residential real estate claim will have special protection. Indeed, if the referent of the "other than" clause is not the secured claim language which precedes it, what could the referent be? It would be most unusual if it were the unsecured claim language or the whole sentence. That strongly indicates that only the "secured claim" portion is protected. We disagree with the courts which have reasoned that section 1332(a)(2) is violated if the unsecured portion of the claim is affected by the plan, because that would modify the rights of a lender who only held a residential real estate mortgage. *See, In re Russell*, 93 B.R. at 705–06. To reach that conclusion would require that we beg the question, for it postulates that the "other than" clause does refer to the unsecured portion of the claim. If it did, the results of those cases would follow, but there is nothing in the statute to suggest that conclusion.

It has been suggested that Congress should have sent the word claim into the "other than" clause flanked on each side by the word "secured." *In re Hynson*, 66 B.R. at 253. Surely not. Congress need not create such an awkward and wooden sentence structure. We also find the suggestion of amicus that the word "such" had been proceeded by the word "claims" to be equally infelicitous, and little more than a bow to legal jargon. As it is, the sentence has a natural rhythm and flow that does not disturb its clarity. That is true, whatever one might think of the drafter's use of commas around the "other than" clause. A word about those commas. There may be cases when a close examination of the much-abused comma is helpful. See the majority and dissenting opinions in *United States v. Ron Pair Enter.*, 109 S.Ct. at pp. 1030–31 and 1035, respectively. It is not particularly helpful in this case. Here, commas or no commas the sense of the sentence remains the same.

It has also been suggested that sections 506(a) and 1322(a)(2) are in conflict. *In re Hemsing*, 75 B.R. [689] at 691 [ (Bkrtcy.D.Mt.1987) ]. As our discussion shows, they are not. They are in harmony when read in the context of the whole statute. That is the way they must be read. *See, Davis v. Michigan Dept. of Treasury,* —— U.S. ——, 109 S.Ct. 1500, 1504, 103 L.Ed.2d 891 (1989).

It is true, that if our construction led to an absurdity, we would be bound to eschew it and look for other guidance. *See, Green v. Bock Laundry Mach. Co.,* —— U.S. ——, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). No such absurdity appears here. The truly secured portion of the residential real estate lender's claim does have special protection. Only the unsecured portion does not. The does not conflict with any of the purposes of the statute, nor does it conflict with the intent of Congress. We are comforted in this decision by the fact that a leading treatise on bankruptcy law agrees with this construction of the statute. 5 *Collier on Bankruptcy*, para. 1322.06[a]

914

(15th Ed.1979). As already noted, other courts are also in agreement.

Some have asserted that the construction we adopt here will severely undermine the statute. *See, e.g., In re Russell*, 93 B.R. [703] at 706 [ (D.N.D.1988) ], and *In re Hynson*, 66 Bankr. at 252. We find no basis for that assertion. In fact, one would think that most residential real estate lenders would see to it that they had a sufficient cushion to avoid finding themselves in an undersecured position. This case presents an exception to that reasoning because the loan was made as part of a social program, and was not driven by pure economics. Another exception may be found when persons who are not true residential real estate lenders secure their loans by taking a security interest in a debtor's home so that they can take advantage of the Chapter 13 provisions. See the discussion in *In re Shaffer*, 84 B.R. 63 (Bankr. W.D.Va.1988). We need not and do not decide whether section 1332(a)(2) covers those lenders at all, but we do note that our reading of the statute would certainly put a crimp in their schemes. Exceptions may test a rule, but these do not require a change in our interpretation of the statute.

Perhaps it would not be amiss to note that those who have set out to harvest the legislative history have only been able to reap the conclusion that Congress intended to benefit residential real estate lenders. *See, e.g., In re Harris*, 94 B.R. [832] at 835–36 [ (D.N.J.1989) ]. We agree, but that is also made obvious by the "other than" clause itself. Any attempt to glean more than that from the legislative history has been unsuccessful. In any event, since in this respect the statute is internally consistent and can be construed without the use of outside aids, there is no real need to concentrate on the legislative history.

*Id.* at 1183–85.

The District Court for the Eastern District of Pennsylvania recently came to the same conclusion as did the Ninth Circuit in *Hougland*. *In re Wilson*, civil action C.A. No. 89–4203, 1989 WL 89956, 1989, U.S. Dist.Lexis 9217 (E.D.Pa.1989). The *Wilson* Court stated as follows:

Nowhere does § 1322 define the term "secured claim". I conclude that "secured claim" means what 11 U.S.C. § 506(a) says it means: that portion of the claim which does not exceed the value of the collateral which in this case is $22,000 plus the value of the furniture and appliances. The remainder of Commonwealth's claim is unsecured and, under § 1322(b)(2), may be modified. *In re Jablonski*, 88 B.R. 652, 657 (E.D.Pa. 1988): Collier on Bankruptcy, 15th Ed., para. 1322.06, p. 1322–15 (1989).

The Court in *In re Frost*, 96 B.R. 804 (Bankr.S.D.Ohio 1989) held that § 506(a) applied in a chapter 13 case notwithstanding § 1322(b)(2). The *Frost* Court also addressed the policy considerations relating to long-term mortgage-backed obligations and the issue of modification, and stated as follows:

This interpretation of § 1322(b)(2) does not unacceptably undercut the Congressional policy of protecting long-term mortgage-backed obligations. The mortgagee certainly has within its control the ratio of collateral value to loan amount which it will approve when it agrees to extend a loan. Normally the lending institution selects the appraiser to establish the property's value. Absent intentional depreciation by a debtor or very abnormal economic times, most holders of first mortgages should be fully secured and, therefore, within the protection of § 1322(b)(2). If their obligations are not so protected, a Chapter 13 debtor may modify the creditor's claim to the extent of the under security. The creditor's allowed secured claim however, must be paid in full with the contract rate of interest unless the claimant agrees to a different treatment. Such treatment satisfies the requirements of 11 U.S.C. § 1325(a)(5).

*Id.* at 807.

The Court in *In re Harris*, 94 B.R. 832 (D.N.J.1989) analyzed the legislative history in depth in arriving at its conclusions that § 506(a) is applicable in a chapter 13

case notwithstanding § 1322(b)(2). The *Harris* Court stated as follows:

The legislative history of § 1322(b)(2) has been used by different courts to reach contrary results on this issue. For example, in *In re Neal,* the court, after extensive study of the legislative history, held that § 1322(b)(2) applied only to claims wholly secured by the principal residence. 10 B.R. [535] at 538–40 [(Bkrtcy.S.D.Ohio 1981)]. To the contrary, the court in *In re Hynson,* utilizing the same history, held that application of the cramdown provisions to claims secured solely by the debtor's principal residence would be at odds with the clear intent of Congress. 66 B.R. at 252–53.

Determination of the legislative intent is also complicated by the fact that a portion of the statute was deleted during the compromise sessions between the House of Representatives and the Senate during the drafting of the Bankruptcy Code. The Senate version of § 1322(b)(2) provided that the plan may modify the rights of holders of secured claims (other than claims *wholly* secured by mortgages on real property) or of holders of unsecured claims ... 10 B.R. at 539 (emphasis added) (quoting S.2266, 95th Cong., 2d Sess. § 1322(b)(2) (1978)). Obviously, had the Senate version been enacted only wholly secured claims i.e. those claims meeting the § 506(a) definition of secured claims, would be entitled to the protection. The House version, however, provided that the plan may "modify the rights of holders of secured claims or holders of unsecured claims." 10 B.R. at 538 (*quoting* H.R. 8200, 95th Cong., 1st Sess. § 1322(b)(2) (1977)). Under this version, no claims would receive protection.

The compromise version, in relevant part, changed the "wholly" in the Senate version to "only" which resulted in the final form of § 1322(b)(2) that the plan may "modify the rights of holders of secured claims, other than a claim secured *only* by a security interest in real property that is the debtor's principal residence...." It is clear that this version represents the intent of Congress to

protect home mortgage lenders. *See, e.g., In re Seidel,* 752 F.2d 1382, 1387 (9th Cir.1985) (court compelled by "legislative history and plain meaning of subsection (b)(2) to uphold Congress' intention to protect home mortgage lenders"). However, it remains unclear whether those lenders must hold secured claims under the § 506 definition to be afforded protection.

After careful review of the conflicting cases and the legislative history, this court holds that the § 1322(b)(2) protection applies only to claims that are "secured claims" as defined by § 506(a). The court rejects the *Hynson* line of cases that focus on the word "claim" in the clause "other than a claim secured only by a security interest in real property that is the debtor's principal residence." 66 B.R. at 253. The *Hynson* approach ignores the preceding clause that states that a plan may "modify the rights of holders of *secured claims.*" *See, Simmons,* 78 B.R. at 303–04. The section provides in full that the plan may "modify the rights of holders of *secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims." (Emphasis added). Clearly, when read in its entire context, the exception clause applies only to those claims that are secured claims as defined by § 506. In addition, the last clause of § 1322(b)(2) adds further support that unsecured claims as defined by § 506(a) may be modified, even those claims that are secured by the debtors' principal residence.

*Id.* at 835–36. (footnotes omitted) (Emphasis in original). *See also, In re Simmons,* 78 B.R. 300, 301–03 (Bankr.D.Kan.1987), which also closely analyzed the legislative history of § 1322(b)(2) and reached the same conclusion as the Court in *In re Harris, supra.* The *Simmons* Court in conclusion stated as follows:

After carefully considering the case on both sides of the issue and the legislative history, this Court must agree with the debtor's position. The special no-modifi-

cation proviso of section 1322(b)(2) does NOT protect an under-collateralized residential second mortgage from a reduction that results from bifurcating its allowable claim into an allowed 100% secured claim and an allowed 100% unsecured claim under section 506(a) and avoiding the unsecured claim under section 506(d). The cases which hold otherwise blindly focus on the clause in section 1322(b)(2) that states: "other than a claim secured only by a security interest in real property that is the debtor's principal residence." *See, e.g., Hynson,* 66 B.R. at 253. The Courts like *Hynson* just ignore the clause immediately preceding that states: "modify the rights of holders of *secured claims."* This Court must interpret this clause as specifically limiting the section 1322(b)(2) protection to fully secured claims.

*Id.* at 303–04.

The Court in *In re Caster,* 77 B.R. 8 (Bankr.E.D.Pa.1987) also stated as follows in interpreting the interplay between § 506(a) and § 1322(b)(2):

> Further, we believe that § 1322(b)(2) serves a purpose even if it is read, as we believe that the principles of statutory construction require, *see, e.g., Clark v. Uebersee Finanz–Korporation,* 332 U.S. 480, 488, 68 S.Ct. 174, 178, 92 L.Ed. 88 (1947); and *Commonwealth of Pennsylvania v. Department of Health & Human Services,* 723 F.2d 1114, 1119 (3d Cir.1983), not as in conflict with, but as *consistently* with, § 506(a) as possible. It prevents debtors from changing the payment terms of claims based on mortgages which actually are fully secured. This is not an inconsiderable impact, because *most* mortgages, particularly first, "purchase-money" mortgages, *are* fully secured due to the combined effect of payments by mortgagors and appreciation of housing values. By and large, it is only a small group of mortgagors, generally those who are financially distressed like the Debtor here, who are able to take advantage of § 506(a) vis à vis their home-purchase mortgagees.

> We therefore believe that our reasoning, expressed at length in *Crompton*

[73 B.R. 800 (Bankr.E.D.Pa.1987)] and *Jablonski,* [70 B.R. 381 (Bankr.E.D.Pa. 1988)] that § 1322(b)(2) protects only those security interest which really exist rather than those of claims which are fully secured on paper only and, in actuality, are undersecured, was clearly correct.

*Id.* at 13.

The Court in *In re Bruce,* 40 B.R. 884 (Bankr.W.D.Va.1984) also noted as follows:

> A review of § 506 further shows a desire on the part of Congress to make certain that creditors claiming to be secured, which, in fact, are not secured, should not enjoy a priority payment status over other unsecured creditors seeking payment of their claims in debtor proceedings. In this case, the significance of § 506 is pronounced in that only the first Deed of Trust note is secured, and the second Deed of Trust note unsecured. To accord FMCC's claim a secured and priority payment status when, in fact, it is not secured in any respect, would unjustly prejudice other general unsecured creditors.

*Id.* at 887–88.

Finally, the Court in *In re Neal,* 10 B.R. 535 (Bankr.S.D.Ohio 1981), after an exhaustive analysis of the legislative history to § 1322(b)(2) stated as follows:

> The statutory scheme of Chapter 13 must be fairly read to permit those debtors to effectively deal with mortgage creditors under a plan which otherwise clearly meets the confirmation standards found in § 1325 of the Bankruptcy Code. For instance, creditors desiring to avoid the judicially imposed alteration (consistent with the authority granted in § 1325 and consistent with due process requirements) of the terms of their obligations may, as a matter of course, take marginally-secured junior mortgages on residential real estate owned by debtors solely to invoke the protection of § 1322(b)(2) should the debtor file a Chapter 13 petition. In this instance, given a superficial interpretation of § 1322(b)(2), debtors would be effectively prevented from pro-

posing a confirmable Chapter 13 plan even though reality would indicate that the junior mortgages had only marginal security (by virtue of the application of § 506(a) of the Code) in the residential real estate owned by the debtors. Thus, not only must this Court find that the protection of § 1322(b)(2) is not available to mortgagees who are junior in priority on overburdened real estate, but it must also deal with the appropriate extent of that protection where only a portion of the mortgagee's claim is so secured.

It is in this context that this Court evaluates the status of FMCC in this case. FMCC has been found to be only partially secured in the residential real estate of this debtor. Further, FMCC is to be paid its entire principal, as well as simple interest at 8% per annum, in a period of time approaching two years less than the original term of the obligation contracted by this debtor. In this Court's opinion, it would violate the spirit of the Chapter 13 law, as well as the legislative intent of Congress, to allow FMCC to veto confirmation of a Chapter 13 plan where, in the final analysis, it is receiving no less than the full benefit of its bargain as that benefit existed at the time of the filing of this Chapter 13 petition. It is well to remember that the assertion of the rights of a creditor in a bankruptcy case rests, under the Code, on the status of that creditor as the holder of a claim, either secured, unsecured, or both. To the extent that the creditor holds a secured claim, as FMCC does in this case, it is entitled (absent its consent otherwise) to have that claim fully paid. The present plan proposed by this debtor, consistent with § 1325(a)(5)(B)(ii) of the Code, so provides. It is a further finding of this Court that had a Chapter 7 case been initiated by this debtor, FMCC would have received less than the full principal amount currently owing on its loan. The debtor, by his plan, proposes to pay that full principal amount of FMCC's loan, with an appropriate discount factor added for the deferred payment schedule. Thus, in this Court's opinion, FMCC can-

not assert that its rights are being modified as that term is used in § 1322(b)(2) of the Bankruptcy Code and as it is interpreted by this Court in the context of the presently proposed Chapter 13 plan. The term "modify" must be read in conjunction with the entire Chapter 13 statutory scheme, including the confirmation standards of § 1325. There is no modification where the secured creditor receives the full value of its secured claim as it existed at the date the petition was filed. *Id.* at 540.

The Bankruptcy Code does not expressly define the words "void" and "modify". The Court in attempting to give ordinary meaning to the words "void" in § 506(d) and "modify" in § 1322(b)(2), in the absence of any legislative history that would indicate that the Court should not give a common and ordinary meaning to those words, has also referred to Black's Law Dictionary. There the word "void" is defined in part as follows:

**Void.** Null; ineffectual; nugatory; having no legal force or binding effect; unable, in law, to support the purpose for which it was intended. *Hardison v. Gledhill*, 72 Ga.App. 432, 33 S.E.2d 921, 924.

\* \* \* \* \* \*

The word "void," in its strictest sense, means that which has no force and effect, is without legal efficacy, is incapable of being enforced by law, or has no legal or binding force, but frequently the word is used and construed as having the more liberal meaning of "voidable."

Black's Law Dictionary, p. 1411 (West Pub. Co. 3rd Ed.1979).

On the other hand the word "modify" is defined as follows:

**Modify.** To alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce. Such alteration or change may be characterized, in quantitative sense, as either an increase or decrease. *Johnson v. Three Bays Properties No. 2, Inc.*, Fla.App., 159 So.2d 924, 926. *See* **Modification.** *Id.* at 905.

"Modification" is defined as follows:

**Modification.** A change; an alteration or amendment which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact.

*Id.* at 905.

Clearly, these two words in the context of construing § 506(d), in conjunction with § 506(a) and § 1322(b)(2) have distinct and separate meanings. It is possible for a security interest to be "modified" in terms of § 1322(b)(2) without being "voided" under § 506(a) and (d). On the other hand, an allowed claim secured by a lien can be "voided" pursuant to § 506(d) in conjunction with § 506(a) without being "modified" pursuant to § 1322(b)(2). That is, a lien may be held to be partially of no force and effect while that portion of the lien that is not voided need not be modified as to its terms.

The same is true of the word "cure" as found in § 1322(b)(3) and (5) as opposed to the word "modify" as found in § 1322(b)(2). The distinction between the word "void" in § 506(d), and the word "modify" in § 1322(b)(2) has never been resolved by the Seventh Circuit Court of Appeals. However, several Circuit Courts of Appeal, including the Seventh Circuit, in passing on the issue of whether a chapter 13 mortgagor can "cure" his defaulted mortgage which has been accelerated pre-petition by "de-accelerating" the mortgage default post-petition have in reviewing the legislative history of § 1322(b)(2), and (3) and (5) pointed out that to "cure" a default under § 1322(b)(3) or § 1322(b)(5) is clearly different than to "modify" the terms of the mortgage instrument itself pursuant to § 1322(b)(2). *See, Matter of Clark,* 738 F.2d 869, 871–77 (7th Cir.1984); *In re Taddeo,* 685 F.2d 24, 27–28 (2nd Cir.1982); *In re Grubbs,* 730 F.2d 236, 241 (5th Cir. 1984); *See also, In re Minick,* 63 B.R. 440, 442–43 (Bankr.D.D.C.1986); *In re Spader,* 66 B.R. 618, 621 (W.D.Mo.1986). Although these cases are obviously not binding precedent as to the issue at bar they do give some insight as to how the word "modify" is viewed in the context of § 1322(b)(2).

Thus, these courts concluded that the debtors could cure the accelerated mortgage without modifying the mortgagee's rights. Cure of default, de-acceleration, and reinstatement of the original terms of an obligation do not result in a "modification".

The Court is again directed to the Seventh Circuit Court of Appeals in *Matter of Clark, supra,* which involved the issue of whether a chapter 13 debtor could cure a prepetition acceleration by a mortgagee. The Court stated:

Under § 1322(b)(2), if what the bankruptcy court did was a modification of the Bank's rights, it was not permitted, as the Bank's claim was secured only by its security interest in the Clarks' property, which includes their principal residence. The Clarks argue that the bankruptcy court merely permitted them to cure the default, which they argue was permitted under (b)(5). The Bank responds that (b)(5) was unavailable here, for reasons we will discuss in a moment. We will address these issues in turn.

The terms "modify" and "cure" are nowhere defined in the Bankruptcy Code. However, it is clear that Congress intended "cure" to mean something different from "modify"; otherwise, in light of (b)(2), (b)(3) would be superfluous. It is well established that a court should avoid a construction of a statute that renders a portion of the statute superfluous. *See, Bird v. United States,* 187 U.S. 118, 124, 23 S.Ct. 42, 44, 47 L.Ed. 100 (1902); *Payne v. Panama Canal Co.,* 607 F.2d 155, 164 (5th Cir.1979); *United States v. Blasius,* 397 F.2d 203, 207 n. 9 (2d Cir. 1968), *cert. dismissed,* 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969).

Absent a persuasive reason to the contrary, we are to attribute to the words of a statute their common meaning. *See e.g., NLRB v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). The common meaning of "cure" is to remedy, restore, remove, or rectify, *see* Webster's Third International Dictio-

nary 555 (1971), and as the term relates to defaults, "cure" means to restore matters to the *status quo ante. See e.g., Jack La–Lanne Biltmore Health Spa, Inc. v. Builtland Partners*, 99 A.D.2d 705, 471 N.Y.S.2d 854, 856 (1984) (default on lease); *Carolina Commercial Bank v. Allendale Furniture Co.*, 280 S.C. 247, 312 S.E.2d 569, 571–72 (1984) (default on mortgage loan); *Chesterton State Bank v. Coffey*, 454 N.E.2d 1233, 1237 (Ind.App.1983) (using cure in the sense of "remedy"); *Federal National Mortgage Association v. Bryant*, 62 Ill. App.3d 25, 28, 18 Ill.Dec. 869, 378 N.E.2d 333, 336 (1978) (mortgage). Ordinarily, the means by which one cures a default is by paying all amounts due and owing; however, "cure" is the end, not the means, and what the term refers to is the restoration of the way things were before the default. Thus, the plain meaning of "cure," as used in § 1322(b)(2) and (5), is to remedy or rectify the default and restore matters to the *status quo ante*.

Acceleration of a debt is a standard consequence of a default in payments. Most notes are like the one the Clarks executed here and provide that the lender can accelerate the payments upon default. Since to cure means to restore matters to the way they were before the default, we think that the power to cure in § 1322(b) necessarily includes the power to de-accelerate the payments on the note. De-acceleration, therefore, is not a form of modification banned by (b)(2) but rather is a permissible and necessary concomitant of the power to cure defaults. *Accord, Grubbs v. Houston First American Savings Association*, 730 F.2d 236 (5th Cir.1984) (en banc); *Taddeo v. DiPerro (In re Taddeo)*, 685 F.2d 24 (2d Cir.1982).

*Matter of Clark*, 738 F.2d 869, 871–872, *supra.* (Footnotes omitted).

This Court also concludes that just as the word "modify" means something different than "cure", the word "modify" in § 1322(b)(2) means something different than "void" in § 506(d) as made applicable by § 506(a).

After a careful review and analysis of the express language of § 506(a), § 506(d), and § 1322(b)(2), the legislative history thereto, and the above reported cases deciding the issue, this Court concludes, as a matter of law, that a chapter 13 debtor may value a claim secured only by the debtor's principal residence pursuant to § 506(a), and to the extent that the amount of the allowed claim exceeds the value of the creditor's interest in such property, i.e. is not an allowed secured claim, the creditor shall have an unsecured claim. The lien that secures a claim that is not an allowed secured claim is void pursuant to § 506(d), and the unsecured portion of the claim can be modified notwithstanding § 1322(b)(2).

The phrase "modify the rights of holders of secured claims" immediately before the phrase "other than a claim secured only by a security interest in real property that is the debtor's principal residence, . . ." in § 1322(b)(2) clearly indicates that the later phrase refers to the prior phrase, and that only the secured claim portion of the claim as defined in § 506(a) is protected from modification. Section 103(a) provides that chapters 1, 3 and 5 apply to chapter 13 without exception. Thus, § 506(a) and (d) are clearly applicable to cases under chapter 13, and no exception is made whereby § 506(a) and § 506(d) do not apply to § 1322(b)(2) in chapter 13 or elsewhere in the Code. The legislative history to § 506(a) states that *"throughout the bill,* references to secured claims are only as to the claim determined by the subsections, and not to the full amount of the creditor's claim." (S.Rep. No. 95–989 95th Cong., 2nd Sess. 68 (1978), *supra* ) (emphasis supplied). The "other than" clause in § 1322(b)(2) does not refer to the unsecured as well as the secured portion of the claim, but only the secured portion.

In addition, the legislative history indicates that the original House version of § 1322(b)(2) in H.R. 8200 simply provided that the plan "may modify the rights of holders of secured claims on holders of unsecured claims" without restriction or any exception as to the principal residence,

while the original Senate version of § 1322(b)(2) in S 2266 provided the plan "could modify the rights of holders of secured claims (other than claims wholly secured by mortgages on real property) or of holders of unsecured claims." The final version deleted the word "wholly" and used the word "only". The reason for this change is not clear. However, the word "wholly" would indicate that the creditor had to be solely or totally secured by the principal residence before a mortgagee was protected by § 1322(b)(2). "Wholly" has been defined to mean, "to the full or entire extent", "totally" or "solely". Webster's Third New International Dictionary Unabridged, (Merriam–Webster, Inc. 1981). The word "only" also can mean merely that no collateral other than the debtor's principal residence could be taken by the secured creditor before it could invoke the protection of § 1322(b)(2) as to its *allowed secured claim* as determined by § 506(a). *See e.g., In re Hink,* 81 B.R. 489 (Bankr.W. D.Ark.1987); *In re Lapp,* 66 B.R. 67 (Bankr.D.Colo.1986); *In re Reeves,* 65 B.R. 898 (N.D.Ill.1986); *In re Ramirez,* 62 B.R. 668 (Bankr.S.D.Cal.1986).

The Court also rejects the assertion that § 506(a) and § 1322(b)(2) conflict, and that because of this conflict the specific language of § 1322(b)(2) must prevail over the general language of § 506(a). These two sections do not conflict and when read in the context of the entire Bankruptcy Code they are harmonious and internally consistent. They do not require the Court to apply the rule of construction that where two statutes conflict, regardless of the general inclusiveness of the general language of a statute it does not apply or prevail over matters specifically dealt with in another part of the same enactment. Further, this construction does not lead to any absurd or inconsistent result, and does not conflict with any of the purposes of chapter 13.

As the Court in *In re Neal,* 10 B.R. 535, *supra* stated as follows:

This Court believes that the various chapter 13 provisions must be read, if possible, as internally consistent in approach and be reconciled, if possible, on a

rational basis. While a conclusion can be drawn that Congress intended to treat specially the rights of a creditor secured only by an interest in residential real estate of the debtor, where a blind application of a clause or word in the statute would result in an undermining of the ability of debtors to effectively use the chapter 13 remedy, the Court should allow the basic statutory scheme to prevail. *United States v. American Trucking Association, Inc.,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). While the meaning of the word "only" may not appear ambiguous on its face, its meaning becomes so when considered in the context of the conflicting provisions of § 1325(a)(5)(B)(ii) of the Code and the over-all remedial purpose of the chapter 13 remedy.

Congress intended to make available the chapter 13 remedy to a wide range of financially distressed debtors, including those debtors who may have one or more mortgages on their homes.

"Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions." Senate Report No. 95 989, 95th Cong., 2d Sess. 141 (1978), U.S.Code & Admin.News 1978, pp. 5787, 5927. *Id.* at 539.

The result reached by this Court will not otherwise "modify" or alter the terms and conditions of the creditor's mortgage instruments. The size and timing of the installment payments will not be altered and thus the scheduled amount of the monthly contract payment will remain the same, as will the interest rate. Obviously the amortization schedule will be changed in that the principal amount of the secured mortgage debt will be reduced to the extent the claim is voided, thus changing the amount of the contract payment allocable to principal and interest. However, the mere fact that the amortization schedule is recast does not result in a modification of the security instrument itself. In addition, other covenants such as the payment of insurance and taxes by the debtor will remain unaffected as will non-pecuniary cove-

nants such as those not to commit waste or further encumber the property. In other words as to the allowed secured claim as defined by § 506(a), the terms, conditions, and covenants found within the four corners of the mortgage or security agreement will not in any way be modified.

In addition, the result reached should not have any considerable impact on first mortgage lenders, in most instances, where the mortgage loan is in fact made based on sound credit judgment, i.e. the value of the property exceeds the actual amount lent. Obviously if the creditor defers exercising its remedies for an undue period of time after default, and allows the interest to accrue, or unusual waste or a decrease in the market value of the realty occurs even a first mortgagee can become undersecured especially if the mortgage loan is of an FHA or VA variety where a nominal down payment is made and there is little equity cushion at the outset. However, if the lender is at all diligent this should not be a frequent state of affairs so as to impair the long-term residential mortgage market.

As to junior and undersecured mortgage holders, they will be receiving what they would receive if the real estate were foreclosed on by the first mortgage outside the framework of bankruptcy, and will suffer no undue prejudice by the application of § 506(a) and § 506(d). Usually, the junior lienholder does not hold a purchase money mortgage, but has made a lend money mortgage to further secure a debt incurred for reasons other than those related to the purchase of a residence. This type of lienholder is not really looking to its collateral to satisfy its debt. Such a mortgage is used primarily as a collection tool with no real prospects of realizing any of the debt out of the proceeds of the actual sale of the collateral, but to use the threat of foreclose to extract voluntary payments.

In addition, if the junior lienholder has taken a purchase-money mortgage, such as a home improvement mortgage, the value of the real estate should increase commensurately, thus at least potentially increasing the amount of its allowed secured claim in an amount equal to at least the principal sum advanced by the mortgagee.

In most instances a junior lienholder's interest in residential property is foreclosed out by the first lienholder upon default, and seldom does a third party bid in an amount at the sheriff's sale that would be sufficient to pay off the senior mortgage and also result in an overplus to the junior lienholder. In addition, very seldom is there sufficient equity over and above that of the senior lienholder's balance to justify a junior lienholder in taking out the senior lienholder in order to avoid having its junior lien foreclosed out. This Court's conclusion enables a chapter 13 debtor to effectively reorganize as to his principal residence and carry out the overall purposes of chapter 13 wherein if § 1322(b)(2) prohibited the application of § 506(a), an undersecured lienholder could effectively block the confirmation of a plan and demand the full balance due on the mortgage, rather than an amount equal to the value of the property, and thus receive substantially more in a chapter 13 than it could receive outside of bankruptcy, assuming any deficiency was uncollectible, or for that matter under a chapter 7 wherein the debtor could clearly invoke § 506(d), and "strip" the liens down to the value of the property. *See, e.g., Matter of Lindsey,* 823 F.2d 189 (7th Cir. 1987). The end result is not to put the secured lender in a grossly inferior position which he would occupy outside of bankruptcy. *Id.* at 191.

Finally, in this way inasmuch as an undersecured creditor is not paid in full on the amount by which its claim exceeds the value of the collateral, i.e. the truly unsecured portion of the claim, other unsecured creditors are not necessarily denied an opportunity to realize to some extent on their claims.

It is therefore,

ORDERED, ADJUDGED, AND DECREED that the Debtors may void the lien of Provident pursuant to § 506(a) and § 506(d) notwithstanding § 1322(b)(2).